IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ROY ALEXANDER MCELROY-CARLOS, JORGE ADALBERTO GUITERREZ-PICADO, and MICHAEL ANTONY NELSON-GAET,<br><br>Defendants. | Crim. Case No: 22-11 |

**UNITED STATES' OPPOSITION TO THE MOTION TO DISMISS**

The United States of America, by and through Delia L. Smith, United States Attorney for the District of the Virgin Islands, and the undersigned Assistant United States Attorney, hereby files its opposition to Defendant Roy Alexander McElroy-Carlos's motion to dismiss.

I.     **FACTUAL AND PROCEDURAL HISTORY**

On March 5, 2022, the Coast Guard observed the vessel bearing Roy Alexander McElroy-Carlos (the "defendant") and his co-defendants 140 nautical miles from Colombia and interdicted it. The vessel did not display any signs of nationality. The individuals on board claimed Nicaraguan nationality for the vessel, but the vessel had no registration. Nicaragua could not confirm or deny the vessel's nationality. On the vessel, the Coast Guard discovered cocaine and marijuana.

The Government subsequently charged the defendants in a two-count information. ECF No. 48. Count One alleges the defendants conspired to possess with intent to distribute approximately 550 kilograms of cocaine on board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. § 70503(c)(1)(A), 46 U.S.C. § 70503(a)(1), 46 U.S.C. § 70504(b)(2), and 46 U.S.C. § 70506(a) & (b). Count Two alleges that the defendants possessed with intent to distribute approximately 550 kilograms of cocaine on board a vessel subject to the

jurisdiction of the United States, in violation of 46 U.S.C. § 70503(c)(1)(A), 46 U.S.C. § 70503(a)(1), 46 U.S.C. § 70504(b)(2), 46 U.S.C. § 70506(a), and 18 U.S.C. § 2.

The defendant subsequently filed the instant motion to dismiss this matter, contending that the Court lacks subject matter jurisdiction and the Maritime Law Enforcement Act ("MDLEA"), 46 U.S.C. § 70501-08, is unconstitutional. ECF No. 72. Co-defendant Jorge Adalberto Guiterrez-Picado joined the motion. The Government opposes the motion.

## II.      ANALYSIS

### A. The MDLEA generally and its statutory application to this case.

The Maritime Drug Law Enforcement Act (MDLEA) makes it a crime to traffic drugs on board a "vessel subject to the jurisdiction of the United States," 46 U.S.C. § 70503(a)(1), (e)(1), which includes a "vessel without nationality," *id.* § 70502(c)(1)(A). The Government can establish that a ship is a "vessel without nationality" by proving that it meets the criteria specified in any of the three examples listed at § 70502(d)(1)(A)-(C) or that it otherwise qualifies as a stateless vessel under international law. The ship in this case qualified as a "vessel without nationality" both because it qualified as a stateless vessel under international law and because it met the specific definition in § 70502(d)(1)(C), which covers "a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality."[1]

---

[1] The defendant contends that provision does not apply to claims of nationality (as opposed to claims of registry). But the MDLEA uses the terms "registry" and "nationality" interchangeably. A ship's nationality reflects a legal connection between a nation and the ship that permits the ship to sail under the nation's flag, *see infra* p. 9, while registry is the method a state uses to keep a record of ships entitled to sail under its flag, *see* H. Meyers, *The Nationality of Ships* 129-30 (1967). Although there are narrow circumstances in which some states may permit a ship to sail under its flag without registration, *see id.* at 149-56, for the most part, "[a] ship that is not registered in any country is stateless," Louis B. Sohn et al., *Law of the Sea in a Nutshell* 73 (2d ed. 2010). Under the United Nations Convention on the Law of the Sea (UNCLOS), every state must

2

As noted by the defendant, the Government has provided a State Department certification, docketed at ECF No. 72-1, which shows that provision applies. The MDLEA provides that the response by the foreign nation to the claim of registry is proved conclusively by the certification.[2] *See* 46 U.S.C. § 70503(d)(2).

---

"maintain a register of ships containing the names and particulars of ships flying its flag, except those which are excluded from generally accepted international regulations on account of their small size." UNCLOS art. 94(2)(a), Dec. 10, 1982, 1833 U.N.T.S. 397. The possibility of excluding "small local vessels or pleasure boats" from the UNCLOS-required "register was created to avoid imposing onerous requirements on small local vessels or pleasure boats which, because of their small size, would not normally be used outside coastal waters." U.N. Convention on the Law of the Sea 1982, A Commentary, vol. III, 146 (Myron H. Nordquist et al. eds., 1995) (Virginia Commentaries). It was not meant to exclude "ocean-going vessels, whatever their size and character or activities," which are expected to "fly a flag indicating their nationality, and therefore must be duly registered and under the jurisdiction and control of the flag State." *Id.* In addition, even though international law does not require registry of some small vessels, many nations nonetheless have a registry procedure for such vessels. *See* Andrew Murdoch, *Ships without nationality: interdiction on the high seas,* in *Maritime Security and the Law of the Sea: Help or Hindrance?* 157, 165-66 (Malcolm D. Evans & Sofia Galani eds., 2020). Thus, as a practical matter, "in the great majority of cases allocation (nationality), registration, documentation, and the flag occur in combination." Meyers, *supra*, at 127. Consequently, "a *pars pro toto* use of the word registration . . . is by no means rare in the doctrine or in the sources of international law," *id.*, and registration is often "used as synonymous with nationality," *id.* at 28.

Consistent with common practice, the MDLEA's use of the terms "registry" and "nationality" indicates no intent to distinguish between the two. *See* Sohn, *supra*, at 43-44 ("Several national laws and international agreements refer to the 'registration' or 'documentation' of a ship rather than its nationality in describing the special relationship between a ship and the state under whose flag it sails[.]"). For instance, the MDLEA provides that a "claim of nationality *or* registry" can be accomplished through "documents evidencing the vessel's *nationality*." 46 U.S.C. § 70502(e)(1) (emphases added). It would not comport with Congress's "intent to reach broadly," *United States v. Matos-Luchi*, 627 F.3d 1, 4 (1st Cir. 2010), if United States jurisdiction were to hinge on whether the vessel's master happens to use one or the other term in claiming a connection with a nation. Rather, where (as here) a master claims nationality for a vessel, that claim is reasonably understood as claiming registry under § 70502(d)(1). Accordingly, the Court should hold that, for purposes of 46 U.S.C. § 70502(d)(1)(C), a claim of nationality includes a claim of registry

[2] The Government agrees that it bears the burden to prove that a vessel is vessel without nationality under the MDLEA. Under the MDLEA, if the Court were to conclude that § 70502(d)(1)(C) were invalid, the Government could still prove that vessel was stateless under international law because the "listed examples" in § 70502(d)(1)(A)-(C) "do not exhaust the scope" of the term "vessel without nationality" in § 70502(c)(1)(A) and that term also includes any vessel that is stateless under international law. *Matos-Luchi*, 627 F.3d at 4; *see id.* at 6-7; *United States v. Nunez*, 1 F.4th

### B. Title 46, United States Code, Section 70502(d)(1)(C) is a constitutional exercise of Congress's Felonies Clause authority.

#### 1. The Felonies Clause does not incorporate international law.

The defendant contends that 46 U.S.C. § 70502(d)(1)(C) is unconstitutional, arguing that it exceeds Congress's authority under the Felonies Clause because 46 U.S.C. § 70502(d)(1)(C) is not consistent with the definition of a stateless vessel under international law, invoking *United States v. Davila-Reyes*, 23 F.4th 153 (1st Cir.*), reh'g en banc granted, opinion withdrawn*, 2022 WL 2444751, 38 F.4th 288 (1st Cir. 2022). But they are incorrect, and this Court should not rely on the withdrawn opinion in *Davila-Reyes*.

Article One, Section Eight, Clause Ten of the United States Constitution ("Clause Ten") provides that "[t]he Congress shall have Power . . . [t]o define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." That provision grants Congress three distinct powers: (1) to define and punish piracies (the "Piracies Clause"); (2) to define and punish felonies committed on the high seas (the "Felonies Clause"); and (3) to define

---

976, 984-85 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 2675 (2022); *United States v. Rosero*, 42 F.3d 166, 170 (3d Cir. 1994); *see also United States v. Miranda*, 780 F.3d 1185, 1197 (D.C. Cir. 2015) (stating that "the statute contains three nonexclusive examples").

Although the occupants claimed Nicaraguan nationality for the vessel, they did not provide documentation to support that claim, a Coast Guard boarding team did not find any indicia of nationality; the vessel was not flying a flag and its hull contained no name, hailing port, or registration number. As reflected in an international agreement between the United States and Nicaragua (and nine other countries), it is "in accordance with international law" to treat a vessel "claiming the nationality of" a signatory nation as "a ship without nationality" where, as here, "no evidence of nationality is found" aboard the vessel. Agreement Concerning Co-Operation in Suppressing Illicit Maritime and Air Trafficking in Narcotic Drugs and Psychotropic Substances in the Caribbean Area art. 16, Apr. 10, 2003, *available at* https://perma.cc/P5KH-MZ2Z (Caribbean Regional Agreement).

The United States went further and contacted Nicaragua to test the claim of nationality, and Nicaragua was unable to confirm the claim. Contacting Nicaragua was not required to establish that the vessel was stateless under international law but merely permitted the United States to invoke the specific definition of a "vessel without nationality" in § 70502(d)(1)(C). The Government does not bear the burden to affirmatively disprove that claim.

4

and punish offenses against the Law of Nations (the "Offenses Clause"). *See United States v. Smith*, 18 U.S. (5 Wheat.) 153, 158-59 (1820).

The Court should reject the defendant's argument that the Felonies Clause incorporates international law for several reasons. First, Clause Ten references international law ("Law of Nations") in the Offenses Clause but not in the Felonies Clause. And in *Smith*, the Supreme Court indicated that the term "Felonies" had no settled meaning at the Founding that was tied to international law. The Court noted that "felonies" did not "have a very exact and determinate meaning" even for common-law offenses committed on land, and further explained that the term was "necessarily somewhat indeterminate" for "offences on the high seas," "since the term is not used in the criminal jurisprudence of the admiralty in the technical sense of the common law." 18 U.S. (5 Wheat.) at 159; *see United States v. Campbell*, 743 F.3d 802, 811 (11th Cir. 2014) (chronicling the ambiguities in the meaning of "felony" at the Founding). Given the indeterminacy in both that term and the category of offenses against the law of nations, the Court saw "a peculiar fitness in giving [Congress] the power to define as well as to punish," and found "not the slightest reason to doubt that this consideration had very great weight in producing the phraseology in question." *Smith*, 18 U.S. (5 Wheat.) at 159; *accord* 3 J. Story, *Commentaries on the Constitution* §§ 1155-58, at 54-56 (1833). Nothing in that reasoning suggests that, in exercising the definitional power afforded it, Congress would be constrained by still-nascent principles of international law.

Indeed, the drafting history of the Felonies Clause points strongly against such constraints. The substitution of the phrase "define and punish" for an earlier version that would have granted Congress the power "[t]o declare the law and punishment of piracies and felonies," was the product of a suggestion by James Madison at the Constitutional Convention. 2 M. Farrand, ed., *Records of the Federal Convention* 315-16 (1911). When one delegate objected that the change was

5

unnecessary because "felonies" was "sufficiently defined by Common law," Madison responded that the term as used in English common law was both "vague" and "defective." *Id.* at 316. "Besides," he continued, "*no foreign law* should be a standard farther than is expressly adopted." *Id.* (emphasis added). Madison then reiterated the impropriety of tying the Felonies Clause to foreign law both in *Federalist 42* and in his remarks to the Virginia Convention in support of ratification. *See The Federalist* No. 42, p. 268 (R. Scigliano ed. 2000) (opining that "neither the common nor the statute law of [England], or of any other nation, ought to be a standard for the proceedings" under the Felonies Clause, and that English law "would be a dishonorable and illegitimate guide"); *The Virginia Convention, 20 June 1788, Debates*, in 10 *The Documentary History of the Ratification of the Constitution* 1413 (1993) (explaining that "Felony is a word unknown to the law of nations, and is to be found in the British laws," but that "[i]t was thought dishonorable to have recourse to th[e latter] standard"). This effort to disassociate the Felonies Clause from the body of foreign law most familiar to the Founding generation makes it unlikely that the Constitution nevertheless *sub silencio* incorporated unnamed international-law limits.

The absence of an international-law limit for the Felonies Clause is also consistent with the principles that govern Congress's exercise of other Article I powers that implicate foreign affairs and international relations. *Cf.* 3 Story, *Commentaries* § 1160, at 57 (calling it "obvious" that Congress's power under Article I, § 8, cl. 10 "has an intimate connexion and relation with the power to regulate commerce and intercourse with foreign nations"). In those contexts, courts recognize that Congress "clearly has constitutional authority to" enact legislation that would violate precepts of international law.[3] *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 815

---

[3] Moreover, although statutes are generally construed to be consistent with international law, if Congress "clearly express[es] its intent to do so"—as it did in the MDLEA—it "may override international law." *United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1056 (3d Cir. 1993).

(1993) (Scalia, J., dissenting); *see, e.g.*, *United States v. Ballestas*, 795 F.3d 138, 144 (D.C. Cir. 2015) (quoting *United States v. Yousef*, 327 F.3d 56, 86 (2d Cir. 2003)). The same framework should apply to legislation enacted under the Felonies Clause.

The defendant nevertheless relies on the First Circuit's decision in *United States v. Davila-Reyes*, 23 F.4th 153 (1st Cir. 2022), where that court held that international law limits congressional authority under the Felonies Clause. But that decision is not even currently the law of the First Circuit, which has granted re-hearing en banc in that case and, for that reason, withdrew the decision and vacated its judgment. *United States v. Davila-Reyes*, 38 F.4th 288 (1st Cir. 2022).

Moreover, that decision is not binding and unpersuasive. In addition to failing to credit the arguments raised above, the panel's analysis is flawed for other reasons. First, it emphasized that Clause Ten, which contains the Felonies Clause, uses terms drawn from the law of nations, such as "Piracies" and "high Seas." *Davila-Reyes*, 23 F.4th at 176-80. But that indicates only that courts may have to consider the law of nations as it stood at the founding when determining the original meaning of those terms. It does not prove that, when it punishes felonies on the high seas, Congress has a constitutional obligation to follow current international law.

Second, the panel relied on passages in which the Framers expressed their respect for the law of nations. *Id.* at 174-77. But the passages discussed in the opinion show that the Framers considered it important for the United States, as a matter of policy, to follow international law; they do not prove that the Framers transformed international law into a constitutional constraint.

Third, to the extent the panel relied on language in *United States v. Furlong*, 18 U.S. (5 Wheat.) 184 (1820), and a similar case, *United States v. Palmer*, 16 U.S. (3 Wheat.) 610 (1818), its reliance was misplaced. As the First and Eleventh Circuits have recognized, in *Furlong*, the Supreme Court was interpreting the 1790 Crimes Act, not resolving a constitutional question or

7

determining what Congress *could* punish under the Felonies Clause. *See United States v. Nueci-Pena*, 711 F.3d 191, 198 n.7 (1st Cir. 2013); *Saac*, 632 F.3d at 1210. Thus, any such discussion was *dicta* and does not govern this case. *See Nueci-Pena*, 711 F.3d at 198 n.7 ("Even Furlong's *dicta,* stating the Act of 1790 could not 'extend [to] the punishment of murder' on the high seas by a foreign crew member against another aboard a foreign vessel because piracy (the crime covered by the statute) is the 'crime within the acknowledged reach of the punishing power of Congress,' *id.* at 193-97, does not stand for the broad proposition that Congress cannot punish felonies such as drug trafficking on the high seas that bear no connection with the United States under the MDLEA."); *Saac*, 632 F.3d at 1210 ("*Furlong*, a statutory interpretation case, therefore, does not resolve the parties' debate over the scope of Congress's constitutional authority."). The same is true of *Palmer*. For all of these reasons, the Court should conclude that international law does not limit Congress's Felonies Clause power.

### 2. Title 46, Section 70502(d§)(1)(C) is consistent with international law.

The Court should also deny the defendant's motion because, even if the Felonies Clause incorporated international law, international law does not prohibit the defendants' prosecution.

As a preliminary matter, international law permits the United States to exercise jurisdiction over the occupants of stateless vessels. In *United States v. Holmes*, 18 U.S. 412 (1820),the Supreme Court held that that "murder or robbery committed on the high seas, may be an offence cognizable by the Courts of the United States, although it was committed on board of a vessel not belonging to citizens of the United States, as if she had no national character, but was possessed and held by pirates, *or persons not lawfully sailing under the flag of any foreign nation*." *Id.* at 417 (emphasis added). And the Court specified that "it makes no difference whether the offender be a citizen of the United States or not." *Id.* For that reason, and because that conclusion is consistent with both

8

two centuries of case law and the fact that individuals "who set out in stateless vessels cannot be said to possess the same reasonable expectation of sanctuary from foreign jurisdiction under international law as those on a flagged vessel would," this Court should conclude that international law permits this prosecution because the defendants committed their crimes on board a stateless vessel. *See United States v. Aybar-Ulloa*, 987 F.3d 1, 7-15 (1st Cir. 2021) (en banc).

The Court should also reject the defendant's argument, citing extensively to the vacated decision in *United States v. Davila-Reyes*, 23 F.4th 153 (1st Cir. 2022), that 46 U.S.C. § 70502(d)(1)(C) is unconstitutional because its definition of statelessness exceeds the international law definition. The definition of a "vessel without nationality" in § 70502(d)(1)(C) is, as a general matter, consistent with the international-law concept of statelessness, and the *Lotus* principle (discussed *infra*) further establishes that the exercise of jurisdiction over vessels that meet the criteria in § 70502(d)(1)(C) is permissible under international law because, at a minimum, international law contains no specific prohibition. In addition, to the extent Congress's authority under the Felonies Clause is limited by international law and international law on stateless vessels speaks at a high level of generality and does not address the nationality (or lack thereof) of vessels in every conceivable scenario, the Felonies Clause and the Necessary and Proper Clause give Congress leeway to enact more detailed provisions specifying circumstances that amount to statelessness.

Under international law, the nationality of a ship reflects the "legal connection between a ship and the flag State." Virginia Commentaries 106. "Whether a ship is entitled to claim attribution to a State is a matter in the first instance for the law of that State to determine." 2 D.P. O'Connell, *The International Law of the Sea* 756 (1984); *see* Louis B. Sohn et al., *Law of the Sea in a Nutshell* 47 (2d ed. 2010). By "grant[ing] its nationality" to a ship, a state "accept[s]

9

responsibility for it and acquir[es] authority over it." *Lauritzen v. Larsen*, 345 U.S. 571, 584 (1953). It is entirely within the authority of a state to "fix the conditions for the grant of its nationality to ships." United States Convention on the Law of the Sea ("UNCLOS") art. 91(1). Where no such connection between a vessel and a state exists, it is a stateless vessel.

It is consistent with international law for the United States to treat a vessel as stateless in the circumstances covered by § 70502(d)(1)(C)—when the master makes a claim of nationality and the United States provides the claimed state with an opportunity to confirm the nationality or registry of the vessel but the claimed state does not or cannot do so. In those circumstances, the claimed nation has not "accept[ed] responsibility for" the ship, *Lauritzen*, 345 U.S. at 584, and there does not exist a "legal connection between [the] ship and" that nation. Virginia Commentaries 106. To confer its nationality on a vessel, a state must "effectively exercise its jurisdiction and control" over the ship. UNCLOS art. 94(1). A ship possesses the nationality of a state when that state is willing and able to exercise authority over the vessel. *See* H. Meyers, *The Nationality of Ships* 241-42, 244, 312, 320 (1967). In the circumstances covered by the definition of a "vessel without nationality" in § 70502(d)(1)(C)—when a nation cannot or is not willing to identify a legal connection with a vessel—those conditions are not present.

International agreements between the United States and multiple nations reflect these principles and confirm that § 70502(d)(1)(C) is consistent with international law. Those agreements provide that even if the master of a vessel claims nationality for the vessel, the United States, without contacting the named country to test the veracity of that claim, may treat the vessel as stateless "in accordance with international law" if the vessel does not fly that nation's flag and no evidence of registration or nationality is found on board the vessel. *See, e.g.*, Agreement Concerning Co-Operation in Suppressing Illicit Maritime and Air Trafficking in Narcotic Drugs

and Psychotropic Substances in the Caribbean Area art. 16, Apr. 10, 2003, *available at* https://perma.cc/P5KH-MZ2Z (Caribbean Regional Agreement).

The MDLEA's non-exhaustive list of vessels without nationality in § 70502(d)(1)(A)-(C) takes a more cautious approach and, when a master aboard a vessel makes a claim of nationality, treats the vessel as without nationality only if the claimed nation "denie[s]" the claim of registry, 46 U.S.C. § 70502(d)(1)(A), or "does not affirmatively and unequivocally assert that the vessel is of its nationality," *id.* § 70502(d)(1)(C).

In contrast, the rule posited by the withdrawn panel opinion in *Davila-Reyes* lacks support in international law and would produce absurd results. A vessel with no state willing to affirm or deny its nationality would escape the jurisdiction of any state, and illegal activity aboard the vessel could be undertaken with impunity and go unpunished by any state. International law does not countenance, let alone require, this absurd result.

The "now-venerable" *Lotus* principle, Michael P. Scharf, *Application of Treaty-Based Universal Jurisdiction to Nationals of Non-Party States*, 35 New Eng. L. Rev. 363, 367 (2001), confirms that international law permits the United States to exercise jurisdiction over a vessel pursuant to § 70502(d)(1)(C). Under the *Lotus* principle, "when a [customary international law] norm does not restrict a nation's actions, there is not a gap in the law but rather a background rule that allows for freedom of action." Curtis A. Bradley & Mitu Gulati, *Withdrawing from International Custom*, 120 Yale L.J. 202, 272 (2010). "Far from laying down a general prohibition to the effect that States may not extend the application of their laws and the jurisdiction of their courts to persons, property and acts outside their territory, [international law] leaves them in this respect a wide measure of discretion which is only limited in certain cases by prohibitive rules," and absent such a prohibitive rule, "every State remains free to adopt the principles which it regards

as best and most suitable." S.S. Lotus (1927), PCIJ (Ser. A) No. 9, at 19. "[T]he question is not whether international law or precedent exists permitting" the exercise of jurisdiction, "but rather whether any international legal rule exists which would prohibit it." Scharf, *supra*, at 367; *see* José A. Cabranes, *Our Imperial Criminal Procedure: Problems in the Extraterritorial Application of U.S. Constitutional Law*, 118 Yale L.J. 1660, 1672-73 & nn.44-45 (2009).

International law does not set forth a single comprehensive definition of a stateless vessel. To the extent international law addresses circumstances that are comparable to those covered by § 70502(d)(1)(C)—in the international agreement discussed above, for example, in which the signatories (including Nicaragua) agreed that it is in accordance with international law to exercise jurisdiction over a vessel as stateless when its occupants make a claim of nationality but there are no other indicia of nationality, *see Caribbean Regional Agreement*, *supra*, art. 16—international law supports the conclusion that vessels meeting the criteria in § 70502(d)(1)(C) are stateless under international law. But even if international law were silent regarding jurisdiction over such vessels, exercising jurisdiction over them would not be inconsistent with discernible international-law principles; insofar as no specific principle of international law prohibits the United States from exercising jurisdiction over vessels covered by § 70502(d)(1)(C), the *Lotus* principle permits it.

Moreover, to the extent international law does not enumerate every feasible circumstance in which a vessel will qualify as a stateless, the definition in § 70502(d)(1)(C) is also a permissible exercise of Congress's authority under the Felonies Clause and the Necessary and Proper Clause, which, in order to provide clear rules proscribing criminal conduct, necessarily permit Congress to adopt more detailed provisions when international law speaks at a higher level of generality.

As explained above, when formulating the Define-and-Punish Clause, the Framers knew that the term "Felonies" was vague, like the contours of the "Law of Nations," since it was "often

12

too vague and deficient to be a rule" for criminally proscribing conduct. Farrand, *supra*, at 615; *see Smith*, 18 U.S. (5 Wheat.) at 159 ("Offences . . . against the law of nations, cannot, with any accuracy, be said to be completely ascertained and defined in any public code recognised by the common consent of nations."). The Framers therefore knew it was necessary to give Congress the power to "define" (not just punish) felonies on the high seas and offenses against the law of nations, a power they knew extended to "creating" offenses. Farrand, *supra*, at 316; *see Smith*, 18 U.S. (5 Wheat.) at 159. Congress accordingly should be afforded "substantial flexibility" in exercising its authority under the Define-and-Punish Clause, "given that Congress is expressly given the power to 'define.'" Bradley, *Universal Jurisdiction and U.S. Law*, 2001 U. Chi. Legal F. at 335 & n.51. When enacting a criminal prohibition, Congress must speak "clearly," *United States v. Lanier*, 520 U.S. 259, 266 (1997), and provide "fair notice of what the law demands," *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019). Thus, if criminal prohibitions that Congress enacts via the Felonies Clause must line up with international law, the Felonies Clause necessarily empowers Congress to adopt more detailed provisions to fill in the interstices of international law to create sufficiently clear criminal prohibitions where international law speaks at a higher level of generality. And even if the Felonies Clause itself were not sufficient, the Necessary and Proper Clause would provide the requisite authority because providing clear provisions for defining stateless vessels, when international law speaks with greater generality, "is rationally related to the implementation of [the] constitutionally enumerated power." *Comstock*, 560 U.S. at 134.

Lastly, even if the defendant's arguments otherwise had merit—they do not—those arguments would fail because the international law protective principle permits the prosecution of the defendants. Under the protective principle, international law has long "recognize[d] the right of a state to punish a limited class of offenses committed outside its territory by persons who are

13

not its nationals—offenses directed against the security of the state or other offenses threatening the integrity of governmental functions that are generally recognized as crimes by developed legal systems." Restatement (Third) of the Foreign Relations Law of the United States § 402 cmt. f (1987); *see* Restatement (Fourth) § 412 (same). This "protective principle does not require that there be proof of an actual or intended effect inside the United States." *United States v. Gonzalez*, 776 F.2d 931, 939 (11th Cir. 1985); *accord* Restatement (Fourth) § 412 reporters' n.1 ("[N]o constituent element of the offense and no actual or intended effect in the territory of the regulating state need be shown."). Rather, "[t]he conduct may be forbidden if it has a potentially adverse effect and is generally recognized as a crime by nations that have reasonably developed legal systems." *Gonzalez*, 776 F.2d at 939.

In enacting the MDLEA, Congress found that "trafficking in controlled substances aboard vessels is a serious international problem, is universally condemned, and presents a specific threat to the security and societal well-being of the United States," 46 U.S.C. § 70501(1)—findings "[c]onsistent with" the application of the protective principle. *United States v. Cardales*, 168 F.3d 548, 553 (1st Cir. 1999). In fact, Congress used language that tracks the Restatement provision, suggesting it intended to apply the protective principle. *See also Gonzalez*, 776 F.2d at 939 (legislative history of 1980 Act shows that Congress "relied on the protective principle").

This Court has no basis for contravening Congress's determinations set forth in § 70501(1). As the Supreme Court has made clear, judgments of the political branches on matters concerning national security and foreign affairs—including judgments embodied in statutory findings—are "entitled to deference." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 29-30, 33-34 (2010). The findings have received bicameral approval in Congress and been presented to the President for signature, as required in our constitutional system. *See INS v. Chadha*, 462 U.S. 919, 951

14

(1983). There is no basis to conclude that Congress lacked a rational basis to find that international drug trafficking is a threat to the United States, especially when carried out on stateless vessels under the circumstances set forth in § 70502(d)(1)(C).

Deference aside, Congress had ample basis for concluding that maritime drug trafficking "presents a specific threat to the security and societal well-being of the United States." 46 U.S.C. § 70501(1). Congress examined the issue at length in the run-up to the 1980 Act and before enacting the MDLEA. *See United States v. Rosero*, 42 F.3d 166, 170 n.5 (3d Cir. 1994) (citing the 1986 Senate Report and 1985 House hearings). The determination it made at the time aligned with contemporaneous assessments in judicial opinions. *See, e.g.*, *United States v. Peterson*, 812 F.2d 486, 494 (9th Cir. 1987) (stating, in dictum, that "[d]rug trafficking presents the sort of threat to our nation's ability to function that merits application of the protective principle"); *United States v. Marino-Garcia*, 679 F.2d 1373, 1381-82, nn.14, 16 (11th Cir. 1982) (similar).

That Congressional judgment also coincided with actions showing that the international community perceived the same threat. Adopted four years before the MDLEA, Article 108 of UNCLOS memorialized the duty of "[a]ll States [to] cooperate in the suppression of illicit traffic in narcotic drugs and psychotropic substances engaged in by ships on the high seas." The United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, Dec. 20, 1988, 1582 U.N.T.S. 95—which was being negotiated at the same time as the MDLEA—soon echoed that need for cooperation in "suppress[ing] illicit traffic by sea" and specified forms of contemplated cooperation in its Article 17. The Convention's Preamble (¶¶ 3, 5) further recognized both "the links between illicit traffic and other related organized criminal activities" that "threaten the stability, security and sovereignty of States," and that the "large financial profits and wealth"

15

generated by drug trafficking enables "transnational criminal organizations to penetrate, contaminate and corrupt the structures of government."

More current data illustrates the continuing threat that maritime drug trafficking in the Western Hemisphere poses. "The vast majority of cocaine destined for the United States initially transits through one or multiple countries," and traffickers use maritime routes to transport the drugs from South America (where it is primarily produced) toward the United States. Drug Enforcement Administration, *2020 National Drug Threat Assessment* 35 (March 2021), *available at* https://perma.cc/C4W7-FGSS; *see id.* at 32-34. Much of the drugs make their way to Mexico, where they are smuggled across the border. *Id.* at 33, 36. Puerto Rico and the U.S. Virgin Islands also "serv[e] as major transshipment points between cocaine-producing countries in South America and the continental United States." *Id.* at 79.

More broadly, illicit drug trafficking "hold[s] back economic and social development" and "constitutes a fundamental threat to security and stability in some parts of the world." United Nations Office on Drugs and Crime, *World Drug Report 2021*, at 3, *available at* https://perma.cc/G9X4-THHL; *see also* Department of State, *International Narcotics Control Strategy Report*, Vol. I, at 4 (March 2022), *available at* https://perma.cc/XVD8-SML8. Information of this sort confirms that, even if an "actual" threat to the United States were required to invoke the protective principle, *United States v. Aybar-Ulloa*, 913 F.3d 47, 58 (1st Cir. 2019) (Torruella, J., dissenting), *vacated*, 987 F.3d 1 (1st Cir. 2021), Congress's findings in the MDLEA accurately identified one.[4] Accordingly, even if the Felonies Clause incorporated international law, the Court should conclude that international law permits the prosecution of the defendants.

---

[4] *United States v. Wright-Barker*, 784 F.2d 161 (3d Cir. 1986), is not to the contrary. There, the Third Circuit noted that "[a]rguably the protective theor[y] may also apply" to the Marijuana on the High Seas Act of 1980, and then stated "[b]ut international agreements have yet to recognize

16

C. **The defendant's nexus argument is barred by binding Third Circuit precedent.**

The defendant also argues that his prosecution violates the Due Process clause because the Government cannot establish a nexus between his actions and the United States. ECF No. 72, at 11. But the Third Circuit has held that due process does not prohibit MDLEA prosecutions for drug trafficking on the high seas, even if there is no nexus between that conduct and the United States. *See United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1056-57 (3d Cir. 1993).

D. **It is not necessary to reach the defendant's subject matter jurisdiction or Sixth Amendment arguments at this time, which nevertheless should be denied.**

The defendant contends that the determination whether a vessel is a vessel subject to the jurisdiction is a determination of the Court's subject matter jurisdiction. ECF No. 72, at 3-4. A circuit split exists on this this issue. *Compare United States v. Prado*, 933 F.3d 121, 132 (2d Cir. 2019) (not subject matter jurisdiction), *United States v. Gonzalez*, 311 F.3d 440, 442-44 (1st Cir. 2002) (same), *with United States v. Miranda*, 780 F.3d 1185, 1192 (D.C. Cir. 2015) (subject matter jurisdiction), *United States v. Tinoco*, 304 F.3d 1088, 1105-06 (11th Cir. 2002) (same), *United States v. Bustos-Useche*, 273 F.3d 622, 626 (5th Cir. 2001) (same).

The better view is that the "vessel subject to the jurisdiction of the United States" inquiry is not a question of subject-matter jurisdiction. The Second Circuit, after an extensive analysis of this issue, correctly adopted that view, reasoning that:

> (i) A general provision of United States law, 18 U.S.C. § 3231, which defines the subject matter jurisdiction of the federal courts in relation to criminal statutes, confers subject matter jurisdiction on the federal courts for such a prosecution. (ii) The Supreme Court, recognizing the many different senses of the word "jurisdiction," has repeatedly warned against construing provisions that limit a statute's coverage as references to subject matter jurisdiction unless that meaning

---

drug smuggling as a threat to a nation's 'security as a state or the operation of its governmental functions,' warranting protective jurisdiction, Restatement § 33." *Id.* at 168 n.5. But, in 1980, when Congress passed the Marijuana on the High Seas Act, it had not made the statutory findings of fact that it later made when it passed the MDLEA. *See* Pub. L. No. 96-350, 94 Stat. 1159.

17

>was "clearly state[d]" in the statute. *See Arbaugh*, 546 U.S. at 515-16, 126 S.Ct. 1235. (iii) The natural meaning of the words of the statute, if they are read in context in the manner in which the various provisions and definitions fit together, make clear that the term "vessel subject to the United States" specifies the reach, or coverage, of the statute and does not in any way address the jurisdiction of the court. (iv) Interpreting the phrase as a limitation *on the court's jurisdiction*, rather than *on the reach of the statute*, would give the prohibitory clauses a highly expansive and improbable meaning that would affront the sovereignty of other nations. (v) The numerous federal statutes that confer subject matter jurisdiction on federal courts uniformly express that concept through very different formulations. (vi) Perhaps most important, the terms "subject to the jurisdiction of the United States" and "vessel subject to the jurisdiction of the United States" appear repeatedly in the MDLEA and other provisions of the same Title 46 (which governs Shipping), in contexts where those phrases refer unmistakably to the reach of United States laws (as exercises of legislative jurisdiction) and not to the jurisdiction of the courts. (vii) The decisions of other courts that have treated the provision as a limitation on court jurisdiction have either not recognized that it could have another meaning or have not recognized that the same phrase is used incompatibly with their interpretation repeatedly throughout title 46, as well as in a parallel provision of the very same MDLEA.

*Prado*, 933 F.3d at 133-34. For those reasons, if this issue becomes relevant, the Court should conclude that the "vessel subject to the jurisdiction of the United States" inquiry is not an inquiry into the Court's subject matter jurisdiction.

But it is unnecessary for the Court to reach that issue here. Courts frequently address whether this inquiry addresses subject-matter jurisdiction in the context of whether a defendant waived the issue by pleading guilty. Indeed, the defendant appears to raise this issue to contend that the issue is not waivable. But waiver is not an issue here because he has raised his argument regarding whether the vessel is a vessel subject to the jurisdiction of the United States.

The only presently conceivable relevance this issue could have to the pending matter, is to the determination of whether the Sixth Amendment requires a jury, not the judge, to determine that the vessel was subject to the jurisdiction of the United States. *See United States v. Tinoco*, 304 F.3d 1088, 1111 (11th Cir. 2002) (concluding that this determination need not be presented to the jury because, among other things, the issue is a matter of subject matter jurisdiction). But that

18

determination is not necessary to reach that conclusion. *See, e.g.*, *United States v. Vilches-Navarrete*, 523 F.3d 1, 19-23 (1st Cir. 2008) (concluding that this matter is not a matter for the jury, even though that court had previously determined that the matter did not go to the court's subject matter jurisdiction). And even if the allocation of this issue to the court were constitutionally problematic—it is not—the remedy would be to submit the issue to the jury, not dismiss the case. Thus, that issue also need not be addressed in the context of a motion to dismiss.

Turning to the merits of the Sixth Amendment argument, the MDLEA provides that "[j]urisdiction of the United States with respect to a vessel subject to this chapter is not an element of an offense. Jurisdictional issues arising under this chapter are preliminary questions of law to be determined solely by the trial judge." 46 U.S.C. § 70504(a). Contrary to the defendant's contentions, 46 U.S.C. § 70504(a) is constitutional, and thus the Court, not the jury, must decide this issue. *Accord Vilches-Navarrete*, 523 F.3d at 19-23; *Tinoco*, 304 F.3d at 1109-10; *but see United States v. Perlaza*, 439 F.3d 1149, 1165 (9th Cir. 2006).[5]

The Supreme Court's decision in *Ford v. United States,* 273 U.S. 593 (1927), confirms that conclusion. In *Ford*, the Court held that defendants were not entitled to a jury determination with respect to the place of a ship's seizure for purposes of a prosecution under the National Prohibition Act, ch. 85, 41 Stat. 305. 273 U.S. at 606. It explained that the issue "did not affect the question of the defendants' guilt or innocence," but instead "only affected the right of the court to hold [them] for trial." *Id.* That reasoning applies equally here. As in *Ford*, whether the United States asserts jurisdiction over the vessel does not pertain to petitioner's participation in, or

---

[5] The defendant also cites to *United States v. Miranda*, where the D.C. Circuit determined that "[t]here [wa]s no basis for overturning the district court's finding that appellants were both involved with 'vessels without nationality," based on a review of the contents of the plea agreement. 780 F.3d 1185, 1197 (D.C. Cir. 2015). But nothing in that case indicates that a jury must decide this issue; in fact, it noted that this issue was not before it. *See id.* at 1195-56.

blameworthiness for, his drug offenses, but instead to the court's ability to try him for those offenses. *See, e.g.*, *Tinoco*, 304 F.3d at 1108-1109. "Congress inserted the requirement that a vessel be subject to the jurisdiction of the United States into the statute as a matter of diplomatic comity," not to define the defendant's culpability. *Vilches-Navarrete*, 523 F.3d at 22.

That result is also consistent with the Supreme Court's holdings in other contexts that factual issues bearing on a defendant's susceptibility to prosecution may be resolved by the trial judge, rather than the jury, when they are not elements of the offense. For example, the determination whether a defendant has previously been placed in jeopardy for the charged offense, has been denied the right to a speedy trial, or has been selected for prosecution on an impermissible basis may all turn in part on findings of historical fact entrusted to judicial resolution. *See, e.g.*, *Wayte v. United States*, 470 U.S. 598, 607-610 (1985); *Oregon v. Kennedy*, 456 U.S. 667, 669-670, 679 (1982); *Barker v. Wingo*, 407 U.S. 514, 530-536 (1972). As such, the Court should hold that 46 U.S.C. § 70504(a) is constitutional.

### III.    CONCLUSION

For the reasons stated above, the United States respectfully requests that the Court deny the motion to dismiss.

Respectfully submitted,<br>
DELIA L. SMITH<br>
UNITED STATES ATTORNEY

Dated: February 10, 2023    By:    s/ Adam Sleeper
Adam Sleeper
Appellate Chief
United States Attorney's Office
District of the Virgin Islands
5500 Veterans Drive, Suite 260
St. Thomas, Virgin Islands 00802
Adam.Sleeper@usdoj.gov
(340) 774-5757